E-FILED
Monday, 24 January, 2022  03:19:36 PM
Clerk, U.S. District Court, ILCD

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

OCT 27 2021

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises located at<br>220 South Fredrick St., Rantoul, IL 61866 more<br>particularly described on Attachment A2 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 21-MJ-7126

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Premises located at 220 South Fredrick St., Rantoul, IL 61866 more particularly described on Attachment A2

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 and 2252A | Tracking Child Pornography, Distribution and Receipt of Child Pornography,<br>Possession and Transportation of Child Pornography |

The application is based on these facts:
See Affidavit of Special Agent Garth Vanskike, Department of Homeland Security (DHS); U.S. Immigration and Customs Enforcement (ICE) and Homeland Security Investigations (HSI)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Garth Vanskike

_____
*Applicant's signature*

Garth Vanskike, DHS - HSI
*Printed name and title*

s/Eric I. Long

attested by telephone.

Sworn to before me and signed in my presence.

Date: _____10/27/2021_____

City and state: _____Urbana, Illinois_____

_____
*Judge's signature*

Eric I. Long, Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Special Agent Garth Vanskike, being first duly sworn, hereby depose and state as follows:

<u>AFFIANT BACKGROUND</u>

1.    I am a Special Agent with the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), and Homeland Security Investigations (HSI), currently assigned to the office of the Springfield, Illinois Resident Agent in Charge office.  I have worked for Homeland Security Investigations since May of 2017.

2.    My first HSI assignment was in HSI Eagle Pass, TX. After that I was assigned to HSI Miami, Florida.

3.    My primary responsibility as an HSI Special Agent is to investigate possible violations of criminal laws, including child exploitation and child pornography offenses, such as those prohibited by 18 U.S.C. § 1591, 2422, 2251, 2252, and 2252A.

4.    In addition to my on-the-job experience and law enforcement training in the areas of child exploitation and child pornography, I've received formal training at the Federal Law Enforcement Training Center.  I have also received training in digital investigations from the Internet Crimes Against Children Taskforce.  I have been trained on, and assisted with, seeking and executing search warrants related to child exploitation offenses.

5.    In my work, I've seen child pornography (as defined in 18 U.S.C. § 2256) in various forms of media (pictures, video), including computer media.

6.    This affidavit is based on my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

7.    Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation.

<u>GENERAL SUMMARY OF PROBABLE CAUSE</u>

8.    There is probable cause to believe that **Justin Ortiz** uploaded child pornography using the internet. This probable cause is based upon three tips from Dropbox and Snapchat to the National Center for Missing and Exploited Children in September 2020, February 2021, and July 2021, regarding the trafficking of child pornography by a user on their platforms.  As will be shown below, the investigation has led to the identification of **Justin Ortiz** as the user and there is probable cause to believe that evidence of **Ortiz's** child pornography activity will be located at the two places he either resides or "stays," and his person.

<u>BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS,<br>AND THE INTERNET</u>

9.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

10.   Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "Wi-Fi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

11. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

12.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person.

3

Smartphones and/or mobile phones are also often carried on an individual's person.

13.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

14.   Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats.   A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.   Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

15.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).   Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   Such information is often maintained indefinitely until overwritten by other data.

4

<u>LOCATIONS TO BE SEARCHED</u>

16.    I request a warrant to search the following:

   a. **Subject Premises 1:** **104 N. Chanute Avenue Apartment 5, Rantoul, IL 61866**, believed to be the residence of Justin Ortiz. This is one-story multi-family residence with taupe siding, white trim, and a brick lower half. One of the doors that faces the fence toward the middle of the building has a number 5 above the peephole on the grey door. I am requesting authority to search the Apartment 5 of this multi-family residence in its entirety, hereinafter referenced as SUBJECT PREMISES 1, and described in Attachment A1.

   b. **Subject Premises 2:** **220 South Fredrick St., Rantoul, IL 61866,** believed to be the location where Justin Ortiz spends the majority of his day employed as a babysitter, for his sister. This location is a two-story single-family residence with green colored siding with green trim and dark gray colored shingles. The door that faces Fredrick St. is white in color and there is a "220" to the right of this door. There is a brown in color brick chimney in the approximate middle of the residence. This single-family dwelling has a detached garage white in color to the rear of the residence. I am requesting authority to search the entire SUBJECT PREMISES 2, including the residential dwelling, detached garage, grounds, any and all vehicles associated with this property, described in Attachment A2.

   c. **The Subject Person:** This application seeks authority to conduct a pat down search of the following person associated with both SUBJECT PREMISES 1 and SUBJECT PREMISES 2, and the primary subject of this investigation, to search for any electronic devices located on their person, if this person is located within the Central District of Illinois, further described in Attachment A3:

      i. **Justin R. Ortiz**, age 33, DOB: 05/23/1988, height: 6'00", weight: 280lbs, race: Caucasian, gender: male.

17.   I am requesting authority to search SUBJECT PREMISES 1 and 2, anywhere where

the items specified in Attachment B may be found. I am requesting authority to locate

5

and seize any and all items listed in Attachment B as instrumentalities or fruits or evidence of a violation of Title 18, United States Code, Sections 2252 and 2252A.

18. Based on the surveillance law enforcement officers have conducted, I believe that Justin Ortiz lives at SUBJECT PREMISES 1 but spends the majority of his day at SUBJECT PREMISES 2, which are half a mile apart, as shown below:



19. I am requesting authority to externally search the clothed person (pat down search) of **Justin Ortiz**, the SUBJECT PERSON – to locate and seize any and all items listed in Attachment B as instrumentalities, or fruits, or evidence of a violation of Title 18, United States Code, Sections 2252, and 2252A.

20. I believe that the instrumentalities or fruits or evidence of a violation of Title 18, United States Code, Sections 2252, and 2252A, will be found on these SUBJECT PERSON phone because, based on my training and experience in the area of child pornography, child sexual offenses, and sexual exploitation of minors, it is common for users of child

pornography to access the pornography on their phones, to upload, download, view, and share the unlawful images and videos.

21.   Due to the proliferation of cellular phones, computers and computing devices and the propensity of people to use such devices for the various forms and types of communication, the use of social media and to search for information concerning areas of interest, including criminal acts, is such that there is a probability that if a cellular phone, computer or computer device is present in the suspect's home or on his person, it may have been used to photograph, memorialize, upload, download, share, depict or discuss the evidence of the criminal acts described above.

22.   In the case of a child pornography, police often find evidence of communication between the suspect(s), witness(es), victim(s) and/or coconspirators about their crimes and subsequent police investigations as well as the efforts by the defendants to avoid arrest or flee from prosecution. Therefore, there exists a probability, considering the totality of the specific and articulable facts presented in this affidavit that data and information relevant and material to this investigation will be found in the devices, software applications (apps) and services referenced and described above.

23.   Based on my training and experience, I know that Google, Yahoo, Snapchat, and Dropbox are applications commonly installed on an individual's mobile device.  I also know that men and women often carry their mobile devices in the pockets of their clothing or in purses.

<u>DEFINITIONS</u>

24.  The following definitions apply to this Affidavit and Attachment B:

a.  "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image of picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b.  "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

c.  "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

d.  "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

e.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware,

8

software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f.  The term "email" (electronic mail) is defined as the text messages sent from one person to another via a computer, which may include images. Email can also be sent automatically to many addresses via a mailing list.

g.  The term "Internet" is defined as the worldwide network of computers, a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

h.  "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. An IP address sometimes contains a series of four numbers, IPv4, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Other IP addresses, referred to as "IPv6 address", appear as a longer series of numbers combined with letters, with blocks or chunks of characters separated by colons. Internet Protocol version 6 (IPv6) is the most recent version of the Internet Protocol (IP), the communications protocol that provides an identification and location system for computers on networks and routes traffic across the Internet. IPv6 was developed by the Internet Engineering Task Force (IETF) to deal with the long-anticipated problem of IPv4 address exhaustion. IPv6 is intended to replace IPv4. In December 1998, IPv6 became a Draft Standard for the IETF, who subsequently ratified it as an Internet Standard on 14 July 2017.

Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers (ISPs) control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might

9

also be "static," if an ISP assigns a user's computer an IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on dates and times.

i.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

j.  The term "web site" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

k.  "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

l.  "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m.  "Cloud" or "Cloud storage," as used herein, is a mechanism in which files can be saved to an off-site storage system maintained by a third-party – i.e., files are saved to a remote database instead of the (user's) computer's hard drive. The Internet provides the connection between the user's computer and the database for saving and retrieving the files.

n.  "electronic communication service" or "electronic service provider" "ESP" means any service which provides to users thereof the ability to send or receive wire or electronic communications.

o.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

p. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

q. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

<u>SERVICES PROVIDED BY DROPBOX</u>

25. Based on my training and experience, I have learned the following about Dropbox's Services:

a. Dropbox Incorporated is a file hosting service that offers cloud storage and file synchronization. Dropbox offers free and paid services that allow users to add photos, documents, videos and files to their account. Dropbox automatically saves these files to all of the user's computers and even the Dropbox website, so they may be accessed from anywhere. Dropbox's free accounts allow up to 2GB of space. Dropbox offers plans that cost $9.99 a month to allow user's 1,000 GB space to store their files, and $15.00 a month to allow user's unlimited storage space.

b. According to Dropbox's privacy policy, at https://www.dropbox.com/privacy, Dropbox collects and stores "the files you upload, download, or access with the Dropbox Service," also collects logs: "when you use the Service, we automatically record information from your Device, its software, and your activity using the Services. This may include the Devices Internet Protocol ("IP") address, browser type, the webpage visited before you came to our website, information you search for on our website, locale preferences, identification numbers associated with your Devices, your mobile carrier, date and time stamps associated with transactions, system configuration information, metadata concerning your Files, and other interactions with the Services." Dropbox records when the user uploads and deletes a file but Dropbox does not record when the user downloads a file.

26. If DropBox believes that a user has uploaded or downloaded child pornography, it will sometimes suspend the services and delete the account.

## IDENTIFYING USERS BY EMAIL

27. Email providers such as Google & Yahoo and social media companies, like Facebook, Inc. as well as other Internet-based businesses associate data to computers, cellular phones and the email addresses and telephone numbers used to access websites. Because of this data association, the provider will have a user profile associated with each account containing information such as that described in Attachment A. This profile identifies the devices the user has used to access the account as well as any other account, product or service associated with it. The provider retains the content of all communications drafted, sent, received and deleted as well as geolocation information related to those communications, and information of the type described in Attachment B.

## CYBERTIP INVESTIGATIONS

28. Electronic Service Providers (ESPs) will provide CyberTips to the National Center for Missing and Exploited Children when files are identified as known or suspected child pornography.

29. The National Center for Missing and Exploited Children ("NCMEC") keeps a database of images and movies that are known to contain images of child pornography. Each image has a "hashtag" value, which enables law enforcement to identify the image as known child pornography. The NCMEC processes and categorizes the types of images it receives.

30. Upon receipt of a CyberTipline report from an ESP such as Dropbox, NCMEC conducts an automatic process to identify the files.

<u>NCMEC TIP #1</u>

31.  On September 16, 2020, National Center for Missing and Exploited Children (NCMEC) received the CyberTipline report from Dropbox reported that a user had been documented uploading child pornography to a Dropbox account. NCMEC generated CyberTipline Report #79647642 which was then forwarded to the Illinois Attorney General's Office, Internet Crimes Against Children (ICAC) division and ultimately forwarded to me due to the associated IP address geo-locating to Rantoul, Illinois located in the Central District of Illinois.

32.  Dropbox identified the Dropbox profile URL as "1800Babyboi@gmail.com" (this email was verified on 11-15-2017 at 00:28:25 UTC), the user name as "Justin O", the ESP User ID: 716613363. The email address associated with the account as "1800babyboi@gmail.com" and the associated IP address as "2600:387:b:5::4e". Dropbox flagged 33 files as suspected child pornography that were uploaded to Dropbox profile URL and Dropbox reported to have viewed all 33 files. Dropbox is reported that at 18:21:22 UTC on 09/15/2020 the reported 33 files were present in the account with the User ID: 716613363.

33.  I reviewed the files uploaded as part of "NCMEC Tip #1" (below).  Five of the files are described herein:

    a.  "big.gif" (A1 file) - This file consisted of a looping video image lasting approximately five seconds in duration. The video shows an unknown race young female, approximately 5-8 years of age, lying on her back on top of a pink colored bedsheet. The young girl's eyes remain closed during the repeating video. The girl has dark colored hair and has a brown fabric, possibly a garment, that is bunched up from her waist covering her torso. Except for the brown fabric, she is naked.  The girl has her hands positioned around her legs

and appears to be pulling her legs back towards her chest. An adult white male penis is shown touching and rubbing back and forth across the girl's vagina. The adult male's left hand can be seen pushing down on his penis to press it against the girl's vagina. The adult male appears to be standing and the girl is positioned on the edge of the bed or furniture. The adult male's face is not visible.

b. "2.gif" - This file consisted of a looping video image approximately 10 seconds in duration. The video was filmed outdoors with three girls, approximately five to eight years in age, lying naked on a red blanket. Tall grass surrounds the girls in the background. Each girl is rubbing what appears to be a dildo sex toy on her vagina.

c. "5c756e24b6ff1a7889b7152bea43fe9d-full.jpg" - This file consisted of a JPG digital photo of two white females, both naked, with one noticeably older (teenager) than the other who appeared physically smaller. The younger female was positioned on her hands and knees with her knees spread widely apart and her buttocks positioned towards the camera. The younger female's face/mouth/nose/ were dropped down but visible by the camera view that showed the girl's face positioned upside down and looking back through the opening between her legs. The older female has both of her hands on the young girl's buttocks, left hand on the girl's right buttock and right hand on the girl's left buttock, spreading them apart to fully expose the girl's vagina and anus. The older female's head and face is not visible, but her breast development is noticeable along with her vagina which does not appear to show any pubic hair. The approximate age of the younger girl is six to nine years of age and the approximate age of the older female is estimated as a teenager.

d. "35ee6d5c10d0e5313fa65c5529d87815.jpg" - This file consisted of a JPG digital photo of a white female toddler, approximately 3-4 years old. The toddler has brown colored hair and is shown sitting naked on a green colored inflatable, small innertube like device, that is positioned in a small kiddie sized wading pool. The toddler's bottom is positioned inside the donut of the inner tube with her legs spread apart clearly exposing her vagina to the camera. The camera is positioned above her and appears to be pointing down towards her to capture the view of her crotch.

e. "4e1e52d67becddb1475c7b2a1d781ab1-full.jpg" - This file consisted of a JPG digital photo of a young white naked female lying on her back on top of what appears to be a bed comforter. The female is approximately 7-10 years of age, showing no visible signs of breast development and no pubic hair present. The girl's legs are spread apart fully exposing her vagina. The camera that took the photo appears to be physically closer to the girl's vagina than to her face. The

girl's arms are raised back towards her head and her hands are touching her head. The girl's face is visible in the photo.

34. On January 14, 2021, Google Payment Corp. responded to a search warrant obtained and executed by Investigator Dwayne Roelfs authorized by Sixth Judicial Circuit in Champaign, Illinois. In response, Google Payment Corp. verified that the email account 1800Babyboi@gmail.com listed a billing name of "Justin O" and a billing address of "Justin O" in Rantoul, IL.

35. Google also indicated that on 11/13/2020, 13:53:43 PM (UTC) a Frontier Communications residential IP address, 50.109.112.18, was used to log into the suspect's Google account, 1800Babyboi@gmail.com. Also, on 09/18/2020, 15:49:55 PM (UTC) and 15:50:18 PM (UTC) a Frontier Communications residential IP address, 50.103.118.84, was used to log into the suspect's Google account. Notably, the 09/18/2020 login was just three days after the Dropbox reported incident date/time.

36. Law enforcement determined that the IP address, 50.109.112.18 and 50.103.118.84, were assigned to the Internet Service Provider Frontier Communications, Everett, WA 98201. On January 7, 2021, Frontier Communications responded to a Department of Justice administrative subpoena and that IP addresses 50.109.112.18 and 50.103.118.84, during the aforementioned times, in November and September 2020, were assigned to the following subscriber:

a.  MAC Address: 98:f7:81:d4:95:e1

b.  E-mail Address: ortiz6661988@gmail.com

c.  Account Address: 411 E Letchworth St., Rantoul, IL

d.  Customer Name: Robert Griem (Mr. Griem is believed to be the owner of this property and not the resident during the time of the downloads in question.)

37.  Law enforcement determined that IP address 2600:387:b:5::4e belonged to AT&T wireless.  A subsequent Department of Justice administrative subpoena to AT&T wireless revealed that they were unable to provide a response because they do not maintain records in the normal course of business with the associated dynamic wireless IP address.

NCMEC TIP # 2

38.  On February 19, 2021, National Center for Missing and Exploited Children (NCMEC) received the CyberTipline report from Dropbox reported that a user had been documented uploading child pornography to a Dropbox account. NCMEC generated CyberTipline Report #86529428 which was then forwarded to the Illinois Attorney General's Office, Internet Crimes Against Children (ICAC) division and ultimately forwarded to me due to the associated IP address geo-locating to Rantoul, Illinois located in the Central District of Illinois.

39.  Dropbox identified the Dropbox profile URL as "just_in66@yahoo.com" (this email was verified on 09-22-2017 at 14:27:03 UTC), the user name as "Justin Ortiz", the ESP User ID: 703380200. The email address associated with the account as "just_in66@yahoo.com" and the associated IP address as "2600:387:b:9::7a" and "2600:387:b:f::85". Dropbox flagged 259 files that were uploaded to Dropbox profile URL and Dropbox reported to have viewed more than 253 files. Dropbox has reported that the incident time to be 02/18/2021 at 18:54:04 UTC.

40. According to the Initial Hash Value Comparison Report: 104482-2021-HC, provided by NCMEC, there were 70 files of recognized hash values and 7 files of child pornography where the child depicted has been identified previously.

41. Detective Nick Kozicki, Elgin Police Department, Elgin, IL, an affiliate ICAC task force member, reviewed the files uploaded as part of NCMEC Tip #2, and described the files as follows:

a. "2015-12-19 17.24.47.jpg" This file depicts an image of a Dropbox screen capture from a mobile device. The image depicts a pre-pubescent female white child with blonde hair lying on her back wearing a pink long-sleeved shirt. The front of the shirt is pulled up and brought behind her head to expose her undeveloped breasts. The child also appears to be naked from the waist down. To the left of the child, from the viewers perspective, there is a male with an erect penis ejaculating on the child's face. The following picture filename was at the bottom of the screen capture: 0d62fca5-d0b9-4153-a9de-277cfc5f18a8.jpg

b. "a3240f6e-1d34-4025-a3f5-13c372d2edb4.jpg" This file depicts two nude females standing in a tub that are described as following: One is a prepubescent female white with undeveloped breasts and no pubic hair and the other is a pubescent female white with developed breasts and pubic hair. Both are standing in the tub with soap suds on them. Both females in this photo appear to be under the age of 18.

c. "ca0ba9ad-cb07-47b5-aa75-5c9cfd23a5d4.jpg" This file depicts the same nude females from a3240f6e-1d34-4025-a3f5-13c372d2edb4.jpg standing in the same tub. They are facing one another and kissing each other on the mouth.

d. "Video 09-01-2016, 20 40 57.mp4" This file depicts a 1 minute 59 second video of a pubescent female white with light brown hair. The letters "AM" are in the upper right hand corner of the video. She starts the video by saying "I'm Haley, Alex's little slut". She then begins to undress until she is fully nude, exposing her developed breasts and vagina. She then sits on a bed and says "This isn't exactly what you told me, but it's what you requested last time". She then begins to masturbate with an electric toothbrush, using the head of the

17

toothbrush to stimulate her vagina. The child in this video appears to be under the age of 18.

e. "Video 02-01-2016, 21 48 32.mp4" This file depicts a 48 second video which appears to be a continuation of the Video 09-01-2016, 20 40 57.mp4 where she is still sitting on the bed and masturbating with an electric toothbrush.

f. "Video 29-11-2015, 19 43 18.mp4" This file depicts a 1 minute 2 second video of the same child from videos Video 09-01-2016, 20 40 57.mp4 and Video 02-01-2016, 21 48 32.mp4. The letters "AM" are in the upper left hand corner of the video. She starts the video by saying "Um, I'm Haley. I'm 14. I'm Alex's little girl. Um OK". She then takes off all of her clothes exposing her developed breasts and vagina. She turns from the camera to show her vagina and anus. She then says "OK" and appears to lay down on a bed and the video stops.

g. "Video 29-11-2015, 20 01 26.mp4" This file depicts a 1 minute 2 second video of the same child from videos Video 09-01-2016, 20 40 57.mp4, Video 02-01-2016, 21 48 32.mp4, and Video 29-11-2015, 19 43 18.mp4. The letters "AM" are in the upper left corner of the video. She is sitting on the floor fully nude and masturbating by inserting the handle of a hairbrush into her vagina. She also masturbates using her hands.

## NCMEC TIP #3

42.   On July 22, 2021, NCMEC received information from Snapchat that apparent child pornography was noted to be present in a user's account. Snapchat noted that the incident occurred on July 21, 2021 at 03:39:29 UTC.

43.   Detective Roelfs, Champaign County Sherriff's Office, Urbana, IL, reviewed the file uploaded as part of NCMEC Tip #3, and described the file as follows:

a. "justin_o1988-None-d7c87fbd-cdac-5dd1-907a-37d043c69b65-324-11f29d4128.mp4" The video was a 20 second video showing one young light skinned naked female with dark colored hair and dark colored eyes, approximately 5-8 years of age. The girl is shown is shown positioned on her back with her left arm crossing her chest and left hand resting on her right

18

wrist. The girl appears to be looking up towards an individual that is initially out of the view of the recording. There appears to be an adult sized individual with dark colored hair that is performing oral sex on the girl. As the video advances a naked adult male steps into the camera recording and his penis is visible as the male places his penis into the mouth of the girl. When the video is played no audio sounds are heard.

44.   The email address associated with the upload was ortiz6661988@gmail.com, the same email address associated with IP addresses for the 1800babyboi@gmail.com logins noted in paragraph 36, above.

45.   The screen/username associated with the upload was "justin_o1988."

46.   The IP address associated with the upload was 50.40.99.221, which is a dynamic IP address that is assigned to Frontier Communications.

47.   On October 8, 2021, SA Vanskike served a DHS/HSI summons to Frontier Communications requesting the subscriber assigned to IP address 50.40.99.221, on the date and time of the transaction. The results of a subpoena served to Frontier Communication confirmed that during the time of this transaction, the IP address of 50.40.99.221 was being utilized by a user located at 220 S. Fredrick St. Rantoul, IL 61866-2433.

48.   The name on the account is Samantha Coronado, Billing Address: 220 S. Fredrick St. Rantoul, IL 61866-2433, Billing number: 217-892-2565, and Contact Telephone Number: 312-259-0838. Coronado is believed to be is Justin Ortiz's sister.

<u>Justin Ortiz Association with the Subject Premises</u>

49.   On May 18, 2021, Rantoul Police Department Officers arrived at 220 S. Fredrick St. Rantoul, IL, SUBJECT PREMISES 2. The Officers were responding to a call concerning

domestic battery. On this date Justin ORTIZ answered that door and stated that he lived

at the residence, "stays" there, and that he is "helping out" as a babysitter. ORTIZ further

stated that there are a "couple" of kids who also live at the residence. During this

encounter, Samantha Coronado speaks to law enforcement while carrying a small child

of unknown gender in her arms, who I believe, based on the child's physical appearance

and size, is no older than two years.

50.  On September 20, 2021, SA Vanskike conducted surveillance at 220 S. Fredrick St.

address and observed a person I recognized as Justin Ortiz arriving at the residence at

approximately 8:52 a.m. I observed Ortiz walking from the direction of 104 N. Chanute

Avenue, Rantoul, IL 61866.

51.  SA Vanskike conducted additional database checks and determined that Justin

Ortiz listed an address of 104 Chanute Avenue Apartment 10, Rantoul, IL 61866. On

September 22, 2021, Rantoul Det. James Barnett observed an individual who matched the

description of Justin Ortiz leave 104 N. Chanute Avenue Apartment 5, Rantoul, IL 61866,

the SUBJECT PREMISES 1. Upon further investigation with the property manager for 104

N. Chanute Avenue, Rantoul, IL 61866, agents learned that Justin Ortiz also resides at 104

N. Chanute Avenue, Apartment 5, Rantoul, IL 61866.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND SMART PHONES

52.  As described above and in Attachment B, this application seeks permission to

search for records in whatever form they are found.  One form in which the records might

be found is data stored on a computer's hard drive (including "smart phones" ) or other

storage media. Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under

Rule 41(e)(2)(B).

53.  There is probable cause to believe those records will be stored on the computer

or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives--contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

54.  As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the

warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

e.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

g.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

h.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log:  computer user account session times and durations, computer activity associated with user

22

accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

i. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

j. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

k. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

l. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a thing is not present on a storage medium. For example, the presence or absence of

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

m. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used, data that was sent or received, notes as to how the criminal conduct was achieved, records of Internet discussions about the crime, and other records that indicate the nature of the offense.

55. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover

"hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

56.  Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access

the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

<u>CHARACTERISTICS COMMON TO INDIVIDUALS WHO DISTRIBUTE,<br>RECEIVE, POSSESS, AND/OR PRODUCE CHILD PORNOGRAPHY</u>

57. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who distribute, receive, possess, and/or produce child pornography:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if **Justin Ortiz** uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the Subject Premises 1, as set forth in Attachment A.

58. Based on the following, I believe that **Justin Ortiz**, described herein residing at premises likely displays characteristics common to individuals who distribute, possess or distribute child pornography. For example, **Ortiz** is also involved in online groups that collect child exploitation materials on multiple platforms

<u>BIOMETRIC ACCESS TO DEVICES</u>

59. This warrant permits law enforcement to compel **Justin Ortiz** (but not any other individuals present at the premises at the time of execution of the warrant) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes, and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."   During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

60.  In my training and experience, users of electronic devices often enable the biometric features because they are a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

61.  As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the

execution of the search authorized by this warrant.

62.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

63.  Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of **Justin Ortiz** to the fingerprint scanner of the devices found at the premises; (2) hold the devices found at the premises in front of the face of **Justin Ortiz** and activate the facial recognition feature; and/or (3) hold the devices found at the premises in front of the face of Justin Ortiz and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search

the contents as authorized by this warrant. The proposed warrant **does not** authorize law enforcement to request that **Justin Ortiz** state or otherwise provide the password or any other means that may be used to unlock or access the devices.  Moreover, the proposed warrant **does not** authorize law enforcement to ask **Justin Ortiz** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

64.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

REQUEST TO SEAL

65.  It is further requested that this Affidavit be sealed by the Court until such time as the Court directs otherwise. Given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation at the SUBJECT PREMISES to the existence of an investigation and likely lead to the destruction and concealment of evidence, and/or flight.

## CONCLUSION

66. I therefore respectfully request that the attached warrants be issued authorizing the search of the SUBJECT PREMISES 1 and 2, and SUBJECT PERSON, as further described in Attachments A1, A2, and A3, and the seizure of the items listed in Attachment B.

s/Garth Vanskike 

Special Agent Garth Vanskike
Homeland Security Investigations (HSI)

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by electronic mail and telephone on October 27, 2021.

s/Eric I. Long

Eric I. Long, Magistrate Judge
United States District Court

**ATTACHMENT A1**
**DESCRIPTION OF LOCATION TO BE SEARCHED**

**(SUBJECT PREMISES 1)**

The entire SUBJECT PREMISES 1  the property located at 104 Chanute Avenue Apartment 5, Rantoul, Champaign County, Illinois, 61866.



104 North Chanute St. Apt. 5, Rantoul, Champaign County, Illinois, 61866



Front Door of 104 North Chanute St. Apt. 5, Rantoul, Champaign
County, Illinois, 61866

## ATTACHMENT A2
## DESCRIPTION OF LOCATION TO BE SEARCHED

### (SUBJECT PREMISES 2)

The entire SUBJECT PREMISES 2 the property located at 220 South Fredrick St., Rantoul, Champaign County, Illinois, 61866.



ATTACHMENT A3

## DESCRIPTION OF LOCATION TO BE SEARCHED

## (SUBJECT PERSONS)

An external search of a clothed Justin R. ORTIZ, a 33-year-old male.



**Justin R. ORTIZ,** (W/M, D.O.B. 05/23/1988)

## ATTACHMENT B

### *Particular Items to Be Seized*

1.  Computer(s), computer hardware, computer software, cell phone, smart phone, removable digital media, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.  Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.  Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in Title 18, United States Code, Section 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

4.  In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in Title 18, United States Code, Section 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), or child erotica.

5.  Any and all address books, names, and lists of names and addresses of individuals who may have been in communication by use of the computer

or by other means for the purpose of distributing or receiving child pornography as defined in Title 18, United States Code, Section 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files, web cache information and handwritten notes) identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in Tile 18, United States Code, Section 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

9.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

10.   Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files)

that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11.    Any and all visual depictions of minors, if such depictions appear to have evidentiary value related to federal laws governing child pornography, child abuse, and child sexual exploitation.

12.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in Title 18, United States Code, Section 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in Title 18, United States Code, Section 2256(2).

13.    Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

14.    Any and all notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

15.  Any and all locked safes or other locked containers that may contain evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2252 and 2252A.

16.  Any and all evidence pertaining to the dates and times of access of the computer or cell phone, the use or knowledge of Google, Facebook, and Dropbox, and internet searches pertaining to the possession or dissemination of child pornography.

17.  Any and all evidence, data or information pertaining to internet history regarding the possession or dissemination of child pornography.

18.  Any and all evidence, data or information pertaining to email addresses used by Justin ORTIZ.

19.  Records and information relating to the sexual exploitation of children, including correspondence and communications between shared users of Google, Facebook, Snapchat, and Dropbox.

20.  Records and information showing access to and/or use of Google, Facebook, Snapchat, and Dropbox.

21.  Records, information, and items relating to violations of the statutes described above including:
     a.  Records, information, and items relating to the ownership or use of the computer or storage media, including sales receipts, bills for Internet access, and handwritten notes;
     b.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above;
     c.  Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites;
     d.  Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES 1 and 2, including utility and telephone bills, mail envelopes, or addressed correspondence.

22.     As used above, the terms "records" and "information" includes all forms
        of creation or storage, including any form of computer or electronic
        storage (such as hard disks or other media that can store data); any
        handmade form (such as writing); any mechanical form (such as printing
        or typing); and any photographic form (such as microfilm, microfiche,
        prints, slides, negatives, videotapes, motion pictures, or photocopies).

23.     The term "computer" includes all types of electronic, magnetic, optical,
        electrochemical, or other high speed data processing devices performing
        logical, arithmetic, or storage functions, including desktop computers,
        notebook computers, mobile phones, tablets, server computers, and
        network hardware.

24.     The term "storage medium" includes any physical object upon which
        computer data can be recorded, including external and internal hard
        drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs,
        gaming systems, SIM cards, cellular phones capable of storage, floppy
        disks, compact discs, magnetic tapes, memory cards, memory chips, and
        other magnetic or optical media.

25.     BIOMETRIC ACCESS: During the execution of the search of the person of
        **Justin Ortiz**, his mobile telephone, and the SUBJECT PREMISES 1 and 2,
        as described in Attachment A1, A2, and A3, law enforcement personnel
        are authorized to compel **Justin Ortiz** to provide biometric features,
        including pressing  fingers (including thumbs) against and/or putting a
        face before the sensor, or any other security feature requiring biometric
        recognition, of any device found on the person of **Justin Ortiz** or in the
        vehicle as described in Attachment A, for the purpose of attempting to
        unlock the device via Touch ID in order to search the contents as
        authorized by this warrant.

26.     This warrant **does not** authorize law enforcement personnel to request
        that **Justin Ortiz** orally state or otherwise provide the password or any
        other means that may be used to unlock or access the computer or storage
        medium, including by identifying the specific biometric characteristics
        (including the unique finger(s) or other physical features) that may be
        used to unlock or access the devices

27.    During the search, photographs of the SUBJECT PREMISES 1 and 2 may also be taken to record the condition thereof and/or the location of items therein.